# SAPONE & PETRILLO, LLP

<u>MANHATTAN</u>

40 Fulton Street, 17th Floor
New York, New York 10038
Telephone: (212) 349-9000
Facsimile: (212) 349-9003
E-mail: ed@saponepetrillo.com

<u>LONG ISLAND</u>

1103 Stewart Avenue, Suite 200
Garden City, New York 11530
Telephone: (516) 678-2800
Facsimile: (516) 977-1977
E-mail: bill@saponepetrillo.com

June 27, 2024

**<u>BY ECF</u>**
The Honorable Loretta A. Preska
United States District Court for the
Southern District of New York
500 Pearl Street
New York, NY 10007

Re:  *United States v. Fargesen*
*Docket No. 21 Cr. 602 (LAP)*

Dear Judge Preska:

For some convicted criminal defendants, a lengthy term of incarceration is necessary. Vitaly Fargesen is not one of them.   We respectfully suggest that a sentence of 39 months of incarceration will satisfy the goals of sentencing under 18 U.S.C. §3553(a)(2) and the parsimony clause.

There can be no doubt that Vitaly's fraud offenses are serious.  But he has taken the right step of entering into a plea agreement with the Government and accepting full responsibility for his misconduct.  And with respect to "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" (*see* 18 U.S.C. §3553(a)(6)), while Vitaly's co-defendant Mr. Palatnik (the "co-defendant") and he played similar roles in the instant offense, their similarities end there.

Vitaly's Guidelines total offense range is 63-78 months of incarceration.  His co-defendant's range is 78-97 months.  The co-defendant was sentenced to the Guidelines minimum of 78 months.  Of the 94 federal districts, the Southern District of New York is the best place to be for criminal defendants relative to receiving a downward variance and the extent of the variance.  It's been the case for a good many years now that more than 50 percent of cases result in a downward variance based on *Booker* alone.  Perhaps the Court considered the co-defendant's obstruction of justice[1] when declining to sentence him below the Guidelines.  It also must be noted that Vitaly's co-defendant peppered his sentencing proceedings with legal objections and a strategy that focused blame on Vitaly.

Vitaly's co-defendant received a Guidelines minimum sentence of 78 months.  If all things were equal, it might be that Vitaly should receive a Guidelines minimum sentence of 63 months.  But, here, things are far from equal.  As we try to avoid unwarranted sentence disparities, it's hard to ignore that Vitaly did not suffer the Guidelines bump that his co-defendant suffered, and he did not obstruct justice in connection with any witness' Rule 17 deposition testimony.  Nor will Vitaly spend even one minute at his sentencing proceedings raising objections or pointing the finger at anyone other than himself concerning his criminal conduct.  We respectfully suggest that these distinctions alone should result in a 24-month sentencing swing, or a sentence of 39 months instead of 63 months.

An analysis of the factors of 18 U.S.C. §3553(a) further underscores that a sentence of 39 months of incarceration is sufficient but not greater than necessary to achieve the goals of sentencing.

---

[1]The co-defendant obstructed justice in connection with his witness' Rule 17 deposition testimony, which occurred shortly before Vitaly and his co-defendant pled guilty.

A look at Vitaly's history and characteristics reveals that he is a 54-year-old man with traumatic childhood memories of life in Ukraine where he and his family suffered terrible abuses simply because they are Jews.  When Vitaly was a small boy, it was commonplace for him to be called terrible names because of his religion.  His dad often explained the difficulties they, as a Jewish family, faced trying to secure employment, housing, and good schooling.

Vitaly came to the United States when he was 10 years of age.  He is a kind man who has always worked hard and who has strived to carve out a good life for himself and his loved ones.  But, sadly, he has lived a life filled with disappointment.

From the time Vitaly became an adult he had three romantic relationships: two marriages and one long-term relationship that did not end in marriage.

Vitaly first married in 1993 when he was 24 years of age. His wife Charina and he remained married for 20 years until 2013.  Their marriage produced three children whose current ages are 30, 28, and 20.  Vitaly always worked hard to support his wife and children.  To this day, even though their marriage did not work, Charina and Vitaly maintain a strong friendship, and Vitaly and his three children are, and always have been, very close.  They divorced amicably and remained devoted to the children making sure the kids had the support of two loving parents. Charina fondly shares that, "[t]hroughout [their] marriage, Vitaly demonstrated a strong commitment to [their] family.  [ . . .] Vitaly possesses qualities that reflect positively in his character.  He is hard-working, responsible, and has a genuine concern for the welfare of [their] children."[2]

---

[2] See *Exhibit A* Letter from Charina Fargesen.

After his first marriage failed, Vitaly met Alyona in 2014 when he was 45 years of age. Although they never married, their relationship lasted for three years until 2017. Together, they have a son who is nine years of age. As with Charina, Vitaly and Alyona are friends to this day and remain supportive of each other.

Vitaly's second marriage was to Beata in 2018 when he was 49. He and Beata have one child together, a son who is five years of age. Just like his other relationships, although this one too ended unsuccessfully, Vitaly and Beata remain as close friends, and Beata remains supportive of Vitaly. They continue to live together as they cannot afford to live apart. Beata is in poor health, and she and their five-year-old son are "completely reliant on" Vitaly. *See* PSR, par. 100.

To Vitaly's credit, while none of his three relationships lasted, all three of these women think the world of Vitaly. To this day, they consider Vitaly as a dear friend. It should be noted that the fact that Vitaly's ex-wives have chosen to maintain a friendly relationship with him says a great deal about Vitaly's character and the respect they have for him.

Vitaly recalls that while his children were growing up, they were always involved with lots of sports and school activities such as dance, hockey, soccer, lacrosse, and competitive cheerleading. Vitaly never missed a practice, game, or tournament. There can be no doubt that Vitaly's large investment of time as a father has paid huge dividends. Thankfully, Vitaly's relationships with his five children are excellent.

Larry Fargesen is Vitaly's younger brother. He has witnessed Vitaly's immense love for his children and his hands-on parenting approach as he shuttled them around to soccer and hockey games and practices, and to dance recitals. In his letter to the Court, he highlights Vitaly's love and devotion to his family:

> Vitaly has always been there for me, and our parents as well. For as long as I can remember my brother Vitaly was my role model growing up. He helped me with my schoolwork, sports, and he'd be the first person I'd turn to if I needed any advice (especially now that I have a daughter of my own). He and our mother are very close, especially now since our father passed away. Our mother lives alone, but Vitaly always makes sure that she is looked after.[3]

Vitaly's son, Kyle Fargesen, remembers the countless weekends that his father spent with him at hockey rinks in different states:

> He wasn't only there physically but was emotionally invested, sharing [his] wins and losses, and guiding [him]with life lessons that extend beyond the ice."  And while Kyle recognizes that his father is going through difficult circumstances, he "genuinely believe[s] in his potential for change and growth . . . . [and has] observed a newfound openness and willingness to change that was not present before.[4]

Similarly, Taylor Fargesen has a close relationship with her father and appreciates all of his support and the sacrifices that he's made for her throughout her life.  Vitaly has always been supportive of Taylor's passions whether that has been horseback riding competitions or tennis lessons.  In her letter, Taylor shares that, "[h]e was and always will be a crucial leg in my mental support system, showing me it's okay to be vulnerable in times when I felt the need to be hard on myself."  "He is, without a doubt, a supportive, selfless, and dedicated father to [herself] and [her] siblings and [she] couldn't possibly imagine [their] lives without him."[5]

---

[3] See *Exhibit B* Letter from Larry Fargesen.

[4] See *Exhibit C* Letter from Kyle Fargesen.

[5] See *Exhibit D* Letter from Taylor Fargesen.

Roman Liter is a New York City retired police officer who is poised to become a police officer in Florida where he now resides.  Mr. Liter met Vitaly in high school 37 years ago and they became fast life-long friends.  In his letter of support, he shares:

> For 37 years we have been and will always be a family. Vitaly has 5 children and I have 2. Our families were woven together by values, faith, parenting, love and loyalty. We've weathered many storms together but today my heart is broken because my friend, my brother and my rock is crumbling and for the first time in my life I'm not sure how I can help him. My dear friend is an amazing person who always helped others when in need. Vitaly just shows up for people and he does so without looking for anything in return. I can honestly say that he is one of the best and most genuine person I know and I'm blessed to have him as my friend.[6]

Clearly, Vitaly has lived a lifetime of failed relationships and disappointments.  But, while he has made mistakes, he also has spent many years working hard, and he has invested lots of time into his five children and all of their activities as he has remained supportive of their mothers.

Over the years, Vitaly's hard work has taken a toll on his body.  In 2020, he underwent an umbilical hernia surgery at Cornell University Hospital in Manhattan.  *See* PSR, par.103. The surgeon failed to insert during the operation a mesh that is used to stabilize the hernia.  As a result, the hernia has gotten worse and has spread to his groin area.  Vitaly has since suffered every day with pain and discomfort.  But Vitaly's physical pain pales in comparison to the emotional pain that he has endured beginning when he was a child who suffered the impact of anti-semitism, and then throughout his life and especially in 2018.

---

[6] See *Exhibit E* Letter from Roman Liter.

In 2018, Vitaly discovered that one of his sons was suffering with opioid addiction. Thank goodness, Vitaly's son never overdosed.  But he had been hospitalized, and he underwent inpatient drug treatment.  Vitaly and his family endured all of the loss, disappointment and pain associated with a loved one under the attack of opioid abuse.

Never by way of excuse, and only by way of explanation, it was the very next year, 2019, that Vitaly was in one of the darkest places in his life when he was suffering alongside his son who was caught in the downward tailspin of opioid addiction.  While in that dark place in life, Vitali committed the instant offense.

The bright side of that pain is that Vitaly and his family have always remained very close and supportive of one another.  This has been a common theme in their lives.  In 1979, when Vitaly was only 10 years old, he and his family remained unified and were granted religious asylum in the United States because of the antisemitism they suffered in Ukraine. While it was difficult, due to their religion, for he and his family to get basic necessities to survive in Ukraine, that negative prior life experience resulted in Vitaly becoming a U.S. Citizen on September 28, 1990.

As the Court reflects upon the whole person being sentenced, I urge Your Honor to consider that the requested sentence will reflect the seriousness of the offense, promote respect for the law and provide just punishment. Vitaly deeply regrets what he did.  His mistakes, however, do not define the person being sentenced.

For its part, the Commission has noted that "dwindling prison space should be reserved for the most serious and dangerous offenders, necessitating a reconsideration of alternative sanctions for first-time and nonviolent offenders." *Alternative Sentencing in the Federal*

*Criminal Justice System*, United States Sentencing Commission, January 2009, pg. 1.  While

Vitaly certainly has made poor choices in his life he is a first-time, nonviolent offender.  He has

lived much of his life as a hard-working, positive and productive member of society.  He does

not need to be imprisoned longer than 39 months to be punished.

For example, Kevin Flanagan runs a car dealership, and a year ago he hired Vitaly as a

salesperson.  Mr. Flanagan was impressed with Vitaly's work ethic noting that, "[w]henever he

has work related obligations he has been willing to stay in order to accommodate a customer's

unique needs or come in early for the same reasons.  When asked to do something he has been

agreeable to doing whatever is needed."[7]

Despite that he was facing the instant pending charges, and although he faced

incarceration, Vitaly did all he could do to make ends meet to support his family and himself.  In

particular, he worked as a driver whose job it was to drive a van across the United States twice a

month.  His trips routinely took a minimum of 10 days, and he took those trips twice a month.

Including wait time, Vitaly had only three or four days off each month, and he drove 16 to 17

hours a day.  Presently, he works full-time for Smyth Volvo on Long Island selling antique cars.

Vitaly is a middle-aged man who has proven that he will take the lawful path to support

his family.   Notwithstanding his mistakes, he is no stranger not only to living a life of hard work

but also one of strong values.

Igor Galitsky, Vitaly's cousin, has "come to know [Vitaly] as an individual of high moral

character, integrity, and a strong sense of responsibility."[8]  Mr. Galitsky believes that "Vitaly is

_____

[7] See Exhibit F Letter from Kevin Flanagan.

[8] See Exhibit G Letter from Igor Galitsky.

genuinely remorseful for any actions that may have led to this situation [and] firmly believe[s] in his capacity for rehabilitation and personal growth."[9]

Todd Kaplan has known Vitaly for five years, and in that time they have become good friends.  Vitaly has proven himself to be a loyal friend who is always willing to provide support and advice.  Mr. Kaplan shares that:

> In numerous conversations over the years, Vitaly has shared with me the profound importance of his family in his life. He consistently emphasizes their well-being and has demonstrated, through his actions, a deep dedication to putting his family first. His commitment to family values has been a cornerstone of his character, and I believe it is a testament to the type of person he is.[10]

Vitaly has been a member of Chabad Center - Mount Sinai Congregation in Newark, New Jersey for the past 17 years.  He is well regarded by Rabbi Yitzchok Bogomilsky who attests that Vitaly "is a man of good character [ . . . ] a loving, caring and providing father [ . . . ] a generous person who has often gone beyond himself to seek the betterment of his fellow man."[11]

The requested sentence will mean that Vitaly, at the end of the day, will have spent many years reporting to either a pretrial services officer or a probation officer, being subjected to strict supervision.  *See United States v. Gall*, 552 U.S. 38, 48-9 (2007) (describing probation as a punishment that "severely restricts an individual's liberty"); quoting *United States v. Knights*, 534 U.S. 112, 119 (2001) (explaining that "[probationers are] subject to several standard conditions

---

[9] Id.

[10] See *Exhibit H* Letter from Todd Kaplan.

[11] See *Exhibit I* Letter from Rabbi Yitzchok Bogomilsky.

that substantially restrict their liberty"); *Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987) (underscoring that "[probationers] do not enjoy the absolute liberty to which every citizen is entitled").

According to Professor Michelle Alexander, "[m]yriad laws, rules, and regulations operate to discriminate against ex-offenders and effectively prevent their reintegration into the mainstream society and economy. These restrictions amount to a form of 'civi[l] death' and send the unequivocal message that 'they' are no longer part of 'us.'" Michelle Alexander, The New Jim Crow 142 (2010).

Further, the requested 39-month sentence will not result in a sentencing disparity relative to the universe of Second Circuit offenders.  An evaluation of the Sentencing Commission's sourcebook[12] is revealing in this regard.  Of the 3,204 defendants sentenced in the Second Circuit in 2023, only 882 (27.5%) received a within-the-guidelines sentence, while 1,684 (52.6%) received a variant sentence.[13]  Of the 1,148 defendants sentenced in the Southern District of New York, only 19.6% received a within-the-guidelines sentence, while 66.9% received sentences below the guidelines minimum sentence based solely on *United States v. Booker*, 543 U.S. 220 (2005), and the factors of 18 U.S.C. §3553(a).[14]

And the requested sentence can provide adequate general and specific deterrence.  The available empirical evidence does not support a finding that a prison sentence necessarily leads to increased deterrent effects, regardless of the type of crime.  *See* Andrew von Hirsch et al.,

---

[12] *See* United States Sentencing Commission Sourcebook of Federal Sentencing Statistics for Fiscal Year 2023.

[13] *See Exhibit J* Sentence Imposed Relative to the Guidelines Range in Each Circuit and District, pg. 1.

[14] *See Exhibit K* District at a Glance Southern District of New York 2023.

Criminal Deterrence and Sentence Severity: An Analysis of Recent Research (1999) (concluding that "correlations between sentence severity and crime rates … were not sufficient to achieve statistical significance," and that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects"); Michael Tonry, Purposes and Functions of Sentencing, 34 Crime and Justice: A Review of Research 28-29 (2006)("[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects. . . . Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence.").

Nonetheless, the requested sentence sends a powerful message to the community that criminality will not be tolerated.  No one looking at this case would think that engaging in crime will pay any dividends.

Studies have also demonstrated that, except for the incapacitation effect of incarceration, there is little apparent correlation between recidivism and imprisonment.  *See* David Weisburd et al., Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes, 33 Criminology 587 (1995) (finding no difference in deterrence for white collar offenders between probation and imprisonment); Donald P. Green & Daniel Winik, Using Random Judge Assignments to Estimate the Effects of Incarceration and Probation on Recidivism among Drug Offenders, 48 Criminology 357 (2010) (study of over a thousand offenders whose sentences varied substantially in prison time and probation found that such variations "have no detectable effect on rates of re-arrest," and that "[t]hose assigned by chance to receive prison time and their counterparts who received no prison time were re-arrested at similar rates over a four-year time frame").  And to be clear, we are not seeking a non-incarceratory sentence.  Therefore, the point

is clear:  There is no empirical data to suggest that a 39-month sentence won't be sufficient to address the goal of specific deterrence.

The Commission has similarly found that "[t]here is no correlation between recidivism and guidelines' offense level. … While surprising at first glance, this finding should be expected. The [G]uidelines' offense level is not intended or designed to predict recidivism." U.S. Sent'g Comm'n, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, at 15 (2004).

And the Commission found that offenders with zero criminal history points have a recidivism rate of only 11.7% (compared with a recidivism rate of 22.6% for offenders with one criminal history point, and 36.5% for offenders with two or more criminal history points).  *See id.*, p. 13-14, 26.

In addition, the U.S. Sentencing Commission a year ago voted to promulgate amendments to §5C1.1 to recommend a non-custodial sentence for certain defendants. First-time offenders with no criminal history points who meet the above factors should receive a non-incarceratory sentence.  Prior to the new amendments, to be considered for a non-custodial sentence (*Booker* variance aside), the offense had to have fallen in Zones A or B. Part B of the new amendment will amend the Commentary to §5C1.1 (Imposition of a Term of Imprisonment) as part of the Commission's implementation of 28 U.S.C. § 994(j). This directed the Commission to make sure that the Guidelines reflect that its general purpose is to impose a non-incarceratory sentence in cases in which the defendant is a first-time offender who has not been convicted of a violent crime or an "otherwise serious offense," regardless of the zone in which the offense falls. Part B of the amendment addresses the alternatives to a term of prison that is available to "zero-

point" offenders by revising the application note in U.S.S.G. §5C1.1 that addresses non 5 violent first-time offenders to focus on "zero- point" offenders.

New Application Note 4(A) provides that if the defendant received an adjustment under new U.S.S.G. §4C1.1 and the applicable Guidelines range is in Zone A or B of the Sentencing Table, a sentence other than a sentence of imprisonment, in accordance with subsection (b) or (c) (3), is generally appropriate. New Application Note 4(B) provides that a departure, including a departure to a sentence other than a sentence of imprisonment, may be appropriate if the defendant received an adjustment under new §4C1.1 and the applicable Guideline range overstates the gravity of the offense, because the offense of conviction is not either a crime of violence or an otherwise serious offense. See U.S. SENT'G COMM'N, REVISITING STATUS POINTS (2022), available at https://www.ussc.gov/research/research-reports/ revisiting-status-points.[15]

Further, while we, in no way, seek to minimize Vitaly's misconduct, and while we continue to stand by the calculation of the Guidelines in the plea agreement, in the context of §3553(a) and the parsimony clause, we ask you to consider the ABA Task Force's "Shadow Guidelines." Before turning to the Shadow Guidelines, it bears mentioning that the authors include judges, all from this Circuit, including SDNY Judge Jed Rakoff, CA2 Judge Gerald Lynch, and former EDNY Judge John Gleeson. And EDNY Judge Eric Vitaliano, in applying the Shadow Guidelines, explained in *United States v. Faibish*, 12-cr-265, [Doc. 271 at 23] (E.D.N.Y. Mar. 10, 2016), that the Guidelines "for economic crimes, in my view, [are] almost useless." Judge Vitaliano went on to state that:

---

[15] To be clear, we seek a variance, and not a downward departure.

> while the current guidelines system does not provide a reasonable way to achieve the kind of sentencing objectives the guidelines are supposed to achieve, and to try to provide fair and just punishment, and not a punishment that is not disproportionate, more uniform, that the ABA task force guidelines certainly significantly move in that direction. … So based on our computations of the economic characteristic, instead of an addition of 22 levels, the ABA guideline would add 12 levels.

Id. at 23-24.

Other judges in this Circuit have similarly cited and relied upon the ABA Task Force's Shadow Guidelines.  For example, in *United States v. Litvak*, No. 3:13 Cr. 19 (JCH) (D. Conn.), Chief Judge Hall stated that she was in "complete agreement with the drafters of this proposal, some of whom are very highly regarded judges in this circuit, in which the drafters urge the courts not to focus on things that are easily quantifiable." Sentencing Tr. at 135–36, *United States v. Litvak*, No. 3:13 Cr. 19 (JCH), ECF No. 298 (D. Conn. July 23, 2014).  Judge Hall sentenced the defendant to 24 months of incarceration whereas the Guidelines recommendation was 108 to 135 months. Id. at 158.

Similarly, in *United States v. Rivernider*, No. 3:10 Cr. 222 (D. Conn.), Judge Robert N. Chatigny of the District of Connecticut applied the Shadow Guidelines in sentencing a defendant convicted of 18 counts of wire fraud and conspiracy to commit wire fraud. Judge Chatigny noted that the Shadow Guidelines' calculation yielding a sentence of 144 months of imprisonment was "preferable to" the 324–405-month calculation under the current Guidelines. Sentencing Tr. at 206, 212.

Ultimately, we stress that we are not asking for a non-incarceratory sentence.  The above analysis, instead, is offered to make the point that the requested 39-month sentence imposed

upon a 54-year-old father of five children, who is non-violent offender, with no criminal history

points and who pled guilty and accepts full responsibility does not violate the parsimony clause.

We recognize that Vitaly has committed crimes, and his history is not spotless.  But we

respectfully request that Your Honor exercise your authority to cause him to suffer a term of

incarceration that will permit him and his family to continue his journey of redemption and

rehabilitation.

On behalf of Vitaly Fargesen and his children, we thank Your Honor for considering this

memorandum.  We look forward to addressing the Court at the sentencing proceedings.


                                        Respectfully submitted,

                                        /s/*Edward V. Sapone*
                                        Edward V. Sapone (ES-2553)

                                        /s/**Steven Brill**
                                        Steven Brill

cc:  AUSA Adam Hobson (by ECF)
     AUSA Sarah Mortazavi (by ECF)